# UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| YE TIONG TAM LIM, | Case No. 1:26-cv-01140-KES-EPG-HC |
| Petitioner, | FINDINGS AND RECOMMENDATION TO GRANT PETITION FOR WRIT OF HABEAS CORPUS AND DIRECT RESPONDENTS TO IMMEDIATELY RELEASE PETITIONER |
| v. | |
| CHRISTOPHER CHESTNUT, et al., | |
| Respondents. | |

Petitioner is a federal immigration detainee proceeding *pro se* with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2241. For the reasons set forth herein, the undersigned recommends that the petition for writ of habeas corpus be granted and Respondents be directed to immediately release Petitioner.

## I.

## BACKGROUND

Petitioner was born in the Philippines and is a citizen of the Philippines and Taiwan. (ECF No. 1 at 2; ECF No. 13-1 at 2.[1]) On November 19, 2013, Petitioner was paroled into the United States for criminal prosecution. (ECF No. 18-5 at 1.) On September 27, 2016, Petitioner was sentenced to an imprisonment term of 138 months for his conviction for conspiracy to import methamphetamine into the United States. (ECF No. 13-2 at 1–2.)

---

[1] Page numbers refer to ECF page numbers stamped at the top of the page.

1

On February 14, 2023, the Department of Homeland Security issued a notice to appear ("NTA"), charging Petitioner as subject to removal pursuant to Immigration and Nationality Act ("INA") sections 212(a)(2)(C) and 212(a)(7)(B)(i)(II). (ECF No. 18-5.) On March 16, 2023, Petitioner was ordered removed to Taiwan by an immigration judge ("IJ"). Both Petitioner and the government waived appeal of that order. (ECF No. 18-4.) After Petitioner was ordered removed, Petitioner was detained until March 14, 2024. He was then released on an order of supervision until he was re-detained during a routine check-in on October 20, 2025. (ECF No. 1 at 2–3.)

On November 19, 2025, Petitioner was scheduled for a flight to Taiwan but was denied entry at the airport. On November 20, 2025, the Taiwan consulate informed U.S. Immigration and Customs Enforcement ("ICE") that Taiwan was denying entry due to Petitioner's crimes. (ECF No. 13-1 at 2.) On November 21, 2025, a request for travel documents was sent to the Philippines. On December 19, 2025, Petitioner received a ninety-day post-order custody review ("POCF"), and it was determined his detention should be continue. On December 26, 2025, ICE sent another request to the Taiwan embassy to grant Petitioner's travel to Taiwan. On January 16, 2026, a travel document request and processing fee was sent to the Philippines consulate general in Los Angeles. The same day, Taiwan officials informed ICE that due to Petitioner's serious crime involving drug smuggling, he is ineligible for entry to Taiwan. On January 28, 2026, ICE received a denial notice from the Philippines consulate in Los Angeles. (ECF No. 13-1 at 3.)

On February 9, 2026, Petitioner filed a petition for writ of habeas corpus, asserting: (1) his continued detention violates due process and Zadvydas because there is no significant likelihood that Petitioner will be removed in the reasonably foreseeable future; (2) Respondents' third country policy violates due process, the INA, the Convention Against Torture ("CAT"), and implementing regulations; (3) Respondents' third country policy violates the Fifth and Eighth Amendments; and (4) Petitioner's re-detention violates the Fifth Amendment, 8 C.F.R. § 241.13, and the Administrative Procedure Act ("APA"). (ECF No. 1 at 13–18.) On February 25, 2026, Respondents filed a response. (ECF No. 13.) On April 9, 2026, Petitioner filed a reply. (ECF No.

2

14.) On May 7, 2026, Respondents filed a supplemental brief. (ECF No. 18.) To date, Petitioner has not filed a reply to Respondents' supplemental brief, and the time for doing so has passed.

## II.

## DISCUSSION

### A. Zadvydas

Congress has enacted a complex statutory scheme governing the detention of noncitizens during removal proceedings and following the issuance of a final order of removal. "Where an alien falls within this statutory scheme can affect whether his detention is mandatory or discretionary, as well as the kind of review process available to him if he wishes to contest the necessity of his detention." Prieto-Romero v. Clark, 534 F.3d 1053, 1057 (9th Cir. 2008).

"Section 241(a) of the Immigration and Nationality Act (INA), codified at 8 U.S.C. § 1231(a), authorizes the detention of noncitizens who have been ordered removed from the United States." Johnson v. Arteaga-Martinez, 596 U.S. 573, 575 (2022). "In particular, § 1231(a)(6) provides that after a 90-day 'removal period,'[2] a noncitizen 'may be detained' or may be released under terms of supervision." Arteaga-Martinez, 596 U.S. at 575. "After the removal period expires, the Government 'may' detain only four categories of people: (1) those who are 'inadmissible' on certain specified grounds; (2) those who are 'removable' on certain specified grounds; (3) those it determines 'to be a risk to the community'; and (4) those it determines to be 'unlikely to comply with the order of removal.'" Id. at 578–79 (quoting 8 U.SC. § 1231(a)(6)).

In Zadvydas v. Davis, 533 U.S. 678 (2001), the Supreme Court addressed a challenge to prolonged detention under § 1231(a)(6) by noncitizens who "had been ordered removed by the government and all administrative and judicial review was exhausted, but their removal could not be effectuated because their designated countries either refused to accept them or the United

---

[2] "The removal period begins on the latest of three dates: (1) the date the order of removal becomes 'administratively final,' (2) the date of the final order of any court that entered a stay of removal, or (3) the date on which the alien is released from non-immigration detention or confinement." Johnson v. Guzman Chavez, 594 U.S. 523, 528 (2021) (citing 8 U.S.C. § 1231(a)(1)(B)). "During the removal period, detention is mandatory." Guzman Chavez, 594 U.S. at 528 (citing 8 U.S.C. § 1231(a)(2)).

States lacked a repatriation treaty with the receiving country." Prieto–Romero, 534 F.3d at 1062 (citing Zadvydas, 533 U.S. at 684–86). The Supreme Court "read an implicit limitation" into the statute "in light of the Constitution's demands," holding that § 1231(a)(6) does not authorize indefinite detention and "limits an alien's post-removal-period detention to a period reasonably necessary to bring about that alien's removal from the United States." Zadvydas, 533 U.S. at 689.

> After [a presumptively reasonable] 6–month period, once the alien provides good reason to believe that there is no significant likelihood of removal in the reasonably foreseeable future, the Government must respond with evidence sufficient to rebut that showing. And for detention to remain reasonable, as the period of prior postremoval confinement grows, what counts as the "reasonably foreseeable future" conversely would have to shrink. This 6–month presumption, of course, does not mean that every alien not removed must be released after six months. To the contrary, an alien may be held in confinement until it has been determined that there is no significant likelihood of removal in the reasonably foreseeable future.

Zadvydas, 533 U.S. at 701.

Here, Respondents contend that Petitioner "has only been detained for four months. Allowing Petitioner to aggregate his previous detention to summarily reach six months would essentially prevent the government from ever detaining him and those similarly situated when relationships with foreign nations change." (ECF No. 13 at 4.) However, the six-month presumptively reasonable detention period and "the burden-shifting framework from *Zadvydas* does not apply" to Ground Four, which concerns Respondents' failure to comply with 8 C.F.R. § 241.13(i) and "ICE's authority to *re-detain* [petitioner] after he was issued a final order of removal, detained, and subsequently released on an [order of supervision]." Yan-Ling X. v. Lyons, 813 F. Supp. 3d 1157, 1163 (E.D. Cal. 2025) (alterations in original) (quoting Nguyen v. Hyde, 788 F. Supp. 3d 144, 149 (D. Mass. 2025)). "[T]his is not your typical first round detainment of an alien awaiting removal. . . . *Zadvydas*, relied upon by Respondents, dealt with the initial detainment of an alien awaiting removal." Escalante v. Noem, No. 9:25-CV-00182-MJT, 2025 WL 2206113, at *3 (E.D. Tex. Aug. 2, 2025).

\\\

**B.  Revocation of Order of Supervision**

In Ground Four of the petition, Petitioner asserts that Respondents failed to comply with 8 C.F.R. § 241.13(i) in re-detaining him. (ECF No. 1 at 16–18.) "Specific regulations, 8 C.F.R. §§ 241.13(i) and 241.4(l), govern how and when ICE may revoke the release of a noncitizen who has been ordered removed." Yan-Ling X., 813 F. Supp. 3d at 1162. 8 C.F.R. § 241.13(i) provides in pertinent part:

> (1) Violation of conditions of release. Any alien who has been released under an order of supervision under this section who violates any of the conditions of release may be returned to custody and is subject to the penalties described in section 243(b) of the Act. In suitable cases, the HQPDU shall refer the case to the appropriate U.S. Attorney for criminal prosecution. The alien may be continued in detention for an additional six months in order to effect the alien's removal, if possible, and to effect the conditions under which the alien had been released.
>
> (2) Revocation for removal. The Service may revoke an alien's release under this section and return the alien to custody if, on account of changed circumstances, the Service determines that there is a significant likelihood that the alien may be removed in the reasonably foreseeable future. Thereafter, if the alien is not released from custody following the informal interview provided for in paragraph (h)(3) of this section, the provisions of § 241.4 shall govern the alien's continued detention pending removal.
>
> (3) Revocation procedures. Upon revocation, the alien will be notified of the reasons for revocation of his or her release. The Service will conduct an initial informal interview promptly after his or her return to Service custody to afford the alien an opportunity to respond to the reasons for revocation stated in the notification. The alien may submit any evidence or information that he or she believes shows there is no significant likelihood he or she be removed in the reasonably foreseeable future, or that he or she has not violated the order of supervision. The revocation custody review will include an evaluation of any contested facts relevant to the revocation and a determination whether the facts as determined warrant revocation and further denial of release.

8 C.F.R. § 241.13(i)(1)–(3).

8 C.F.R. § 241.4(b)(4) provides:

> Service determination under 8 CFR 241.13. The custody review procedures in this section do not apply after the Service has made a determination, pursuant to the procedures provided in 8 CFR 241.13, that there is no significant likelihood that an alien under a final order of removal can be removed in the reasonably foreseeable future. However, if the Service subsequently determines, because of a change of circumstances, that there is a

significant likelihood that the alien may be removed in the reasonably foreseeable future to the country to which the alien was ordered removed or to a third country, the alien shall again be subject to the custody review procedures under this section.

8 C.F.R. § 241.4(b)(4). With regard to revocation, 8 C.F.R. § 241.4(*l*) provides in pertinent part:

(1) Violation of conditions of release. Any alien described in paragraph (a) or (b)(1) of this section who has been released under an order of supervision or other conditions of release who violates the conditions of release may be returned to custody. Any such alien who violates the conditions of an order of supervision is subject to the penalties described in section 243(b) of the Act. Upon revocation, the alien will be notified of the reasons for revocation of his or her release or parole. The alien will be afforded an initial informal interview promptly after his or her return to Service custody to afford the alien an opportunity to respond to the reasons for revocation stated in the notification.

(2) Determination by the Service. The Executive Associate Commissioner shall have authority, in the exercise of discretion, to revoke release and return to Service custody an alien previously approved for release under the procedures in this section. A district director may also revoke release of an alien when, in the district director's opinion, revocation is in the public interest and circumstances do not reasonably permit referral of the case to the Executive Associate Commissioner. Release may be revoked in the exercise of discretion when, in the opinion of the revoking official:

(i) The purposes of release have been served;
(ii) The alien violates any condition of release;
(iii) It is appropriate to enforce a removal order or to commence removal proceedings against an alien; or
(iv) The conduct of the alien, or any other circumstance, indicates that release would no longer be appropriate.

8 C.F.R. § 241.4(*l*)(1)–(2).

1.  Change of Circumstances

The "regulations at 8 C.F.R. §§ 241.13(i) and 241.4(l) apply to non-citizens in petitioner's situation and outline the process to be followed," including that "when ICE revokes release to effectuate removal, 'it is [ICE's] burden to show a significant likelihood that the alien may be removed.'" Yan-Ling X., 813 F. Supp. 3d at 1163 (alteration in original) (quoting Escalante, 2025 WL 2206113, at *3) (citing Roble v. Bondi, No. 25-CV-3196 (LMP/LIB), 2025 WL 2443453, at *4 (D. Minn. Aug. 25, 2025) ("[T]he regulations at issue in this case place the burden on ICE to first establish changed circumstances that make removal significantly likely in

6

the reasonably foreseeable future."); <u>Abuelhawa v. Noem</u>, No. 4:25-CV-04128, 2025 WL 2937692, at *8 (S.D. Tex. Oct. 16, 2025) ("[U]pon revocation of release, the Government bears the burden to show a significant likelihood that the alien may be removed in the reasonably foreseeable future."); <u>Nguyen</u>, 788 F. Supp. 3d at 150).

Respondents submitted a deportation officer declaration, which states in pertinent part:

> 11. On October 20, 2025, Petitioner was taken into immigration custody to execute his final order of removal.
>
> 12. On November 19, 2025, Petitioner was scheduled for a flight to Taiwan via EVA Air but entry was denied.
>
> 13. On November 20, 2025, the Taiwan consulate informed ICE that Taiwan was denying Petitioner entry due to his crimes.
>
> 14. On November 21, 2025, a request for a travel document was sent to the Philippines. Petitioner has never indicated any fear of returning to the Philippines where he was born and his family still lives.
>
> 15. On December 19, 2025, Petitioner received a 90-day post-order custody review ("POCF"), and it was determined his detention should continue.
>
> 16. On December 26, 2025, ICE sent another request to the Taiwan embassy to grant Petitioner's travel to Taiwan.
>
> 17. On January 16, 2026, a travel document request and processing fee was sent to the Philippine consulate general in Los Angeles. The same day, Taiwan officials informed ICE that due to Petitioner's serious crime involving drug smuggling, he is ineligible for entry to Taiwan.
>
> 18. On January 28, 2026, ICE received a denial notice from the Philippines Consulate in Los Angeles. Efforts to negotiate acceptance of Petitioner with the Philippines consulate are continuing.
>
> 19. Petitioner remains detained under 8 U.S.C. § 1231.
>
> 20. Because Petitioner has a valid unexpired passport and is both a native and citizen of the Philippines, ICE believes that it will be able to effectuate Petitioner's removal to the Philippines in the next three months.
>
> 21. In the past six months, ICE has scheduled monthly removal flights to the Philippines for similarly situated individuals with final orders of removal based on serious crimes.

(ECF No. 13-1 at 2–3.)

Respondents do not provide any further details regarding ICE's "[e]fforts to negotiate acceptance of Petitioner with the Philippines consulate." (ECF No. 13-1 at 3.) Almost four months have elapsed since the date of the deportation officer's declaration and nothing has been filed with the Court regarding any forthcoming removal to the Philippines. "Respondents fail to explain why [the Philippines] did not issue a travel document in the past or why [the Philippines] is likely to issue a travel document for petitioner in the reasonably foreseeable future." Yan-Ling X., 813 F. Supp. 3d at 1164. Although the deportation officer states that in "the past six months, ICE has scheduled monthly removal flights to the Philippines for similarly situated individuals with final orders of removal based on serious crimes," (ECF No. 13-1 at 3), the declaration does not specify if the Philippines accepted these similarly situated individuals after recently denying travel document requests for them, as is the case for Petitioner.

In the supplemental brief, Respondents note that "Respondents still believe Petitioner's removal is reasonably foreseeable and as recently as April 1, 2026, applied to Taiwan for a travel document on behalf of Petitioner." (ECF No. 18 at 2.) Respondents have not "attempted to show why obtaining a travel document is more likely this time around" when as recently as January 16, 2026, Taiwan officials informed ICE that due to Petitioner's serious crime involving drug smuggling, he is ineligible for entry to Taiwan. Hoac v. Becerra, No. 2:25-CV-01740-DC-JDP, 2025 WL 1993771, at *4 (E.D. Cal. July 16, 2025).

Accordingly, Respondents have failed to satisfy their burden that changed circumstances have made Petitioner's removal significantly likely in the reasonably foreseeable future as required by 8 C.F.R. § 241.13(i). Therefore, the undersigned recommends finding that Petitioner's re-detention was unlawful and his immediate release from custody is warranted.[3] See Nguyen, 788 F. Supp. at 152–53 ("ICE's individualized determination to re-detain Mr. Nguyen is not in compliance with 8 C.F.R. § 241.13(f), (i)(2)" and "[b]ased on ICE's violations of its own regulations, I conclude that Mr. Nguyen's detention is unlawful and that his release is appropriate."); Liu, 2025 WL 1696526, at *3 ("Accordingly, the Court concludes that because officials did not properly revoke petitioner's release pursuant to the applicable regulations, that

_____

[3] In light of this conclusion, the Court declines to address Petitioner's Zadvydas claim.

revocation has no effect, and petitioner is entitled to his release (subject to the same Order of Supervision that governed his most recent release)."); Yan-Ling X., 813 F. Supp. 3d at 1167 ("Petitioner has shown that she is likely to succeed on her claim that ICE did not have sufficient grounds to re-detain her under the regulations, and that her re-detention was therefore unlawful. Her immediate release is required to return her to the status quo ante.").

> 2.   Pre-Deprivation Hearing

"[M]any courts in this district have found that when a non-citizen subject to a final order of removal is released on OSUP and is re-detained years later, the non-citizen is entitled to a pre-deprivation hearing prior to detention due to an accrued liberty interest." Huang, 818 F. Supp. 3d at 1166 (citing J.L.R.P. v. Wofford, No. 1:25-cv-01464-KES-SKO (HC), 2025 WL 3190589, at *8–10 (E.D. Cal. Nov. 14, 2025); Alva v. Kaiser, No. 25-cv-06676-RFL, 2025 WL 2419262, at *3–5 (N.D. Cal. Aug. 21, 2025)). Applying the Mathews v. Eldridge, 424 U.S. 319 (1976), factors, the J.L.R.P. court "found that the petitioner was entitled to a bond hearing prior to re-detention because":

> (1) petitioner had a significant private interest in remaining free from detention after being out of custody for nearly four years and built normal attachments to life (2) the risk of erroneous deprivation is high because 8 C.F.R. §§ 241.13 and 241.4 do not provide for review of ICE's reasons for revocation by a neutral arbitrator and (3) the government's interest in detaining petitioner without a hearing is low because in immigration court, custody hearings are routine with minimal costs.

Huang, 818 F. Supp. 3d at 1166 (citing J.L.R.P., 2025 WL 3190589, at *9–10). "Similarly, in *Alva*, the court found a due process violation where the government detained a non-citizen with a final order of removal, released on OSUP for over six years, without a pre-deprivation hearing." Huang, 818 F. Supp. 3d at 1166 (citing Alva, 2025 WL 2419262, at *3–5). Likewise, in Huang, the court found a due process violation where the government detained the petitioner with a final order of removal, released on OSUP for nearly seven and a half years, without a pre-deprivation hearing. Huang, 818 F. Supp. 3d at 1166–67.

Based on the foregoing, the undersigned recommends finding that "in the event of his re-detention, Petitioner has a right to a pre-deprivation hearing where the government bears the

burden of showing that Petitioner's release poses a flight risk or danger to the community." Huang, 818 F. Supp. 3d at 1166–67 (citing J.L.R.P., 2025 WL 3190589, at *9–10; Alva, 2025 WL 2419262, at *3–5).

**C. Third Country Removal**

In Grounds Two and Three, Petitioner challenges Respondents' third country removal policy as unlawful and in violation of due process. (ECF No. 1 at 14–16.) In the answer, Respondents contend that "all of Petitioner's contentions regarding his *unlikely* removal to a third country (besides Taiwan and the Philippines) are purely speculative and not ripe for adjudication." (ECF No. 13 at 6–7.) In the reply, Petitioner argues that "to the extent the Philippines is not listed in Mr. Lim's removal order, [the government] is already trying to" remove him to a third country. (ECF No. 16 at 4.) In the supplemental brief, Respondents argue that "even though the removal order does not expressly enumerate the Philippines as an alternative country for removal, the allegation that Petitioner is a *citizen* of the Philippines was sustained, and Petitioner did not apply from any relief from removal to any listed [country] in his NTA, whatsoever" and thus, "Petitioner's removal order sustained based on the allegations and charges in the NTA does not prohibit Petitioner's removal to the Philippines." (ECF No. 18 at 2.)

"In recent months, the Government's policy regarding third country removals has shifted substantially. In particular, policy memoranda issued on March 30 [the Noem Memo] and July 9 [the Lyons memo] by DHS have become frequently discussed in similar cases[.]" Escobar v. Chestnut, No. 1:25-cv-01801-DJC-EFB, 2025 WL 3687639, at *2 (E.D. Cal. Dec. 19, 2025).

> The Noem Memo provides two different tracks for removals of noncitizens to third countries, determined primarily by whether the third country in question "has provided diplomatic assurances that aliens removed from the United States will not be persecuted or tortured." (Noem Memo at 10). In instances in which the United States "has received such assurances," which the Department of State "believes to be credible," then "the alien may be removed *without the need for further procedures.*" (*Id.* at 10-11) (emphasis added).
>
> In instances where the United States has *not* received such assurances – or has received assurances but "does not believe them to be credible" – ICE is required to follow a separate procedure. (*Id.* at 11). In those cases, ICE will "inform the alien of removal to that country" but "will not affirmatively ask whether the alien is

10

afraid of being removed to that country." (*Id.*). Only where a noncitizen "affirmatively states a fear of removal" will they be referred to "screening for eligibility for protection under INA § 241(b)(3) and the Convention Against Torture (CAT) for the country of removal." (*Id.*). The Noem Memo provides further guidance as to those noncitizens who *do* affirmatively state a fear of removal to the third country. (*Id.*). It states that the noncitizen will generally be screened within twenty-four hours, after which USCIS "will determine whether the alien would be more likely than not to be persecuted on a statutorily protected ground or tortured in the country of removal." Where a noncitizen does not meet this standard, they "will be removed." (*Id.*). If the noncitizen meets this standard, then the matter will be referred to Immigration Court. (*Id.*). Where the individual in question "was previously in proceedings before the Immigration Court," the immigration officer will inform ICE, which "may file a motion to reopen with the Immigration Court or the Board of Immigration Appeals, as appropriate, for further proceedings" to determine eligibility for protection under INA § 241(b)(3) or CAT for the country of removal. (*Id.*).

The Lyons Memo was issued in light of the Supreme Court's granting the Government's application to stay the district court's nationwide preliminary injunction in *D.V.D. v. Dep't of Homeland Security*, No. 25-10676, 2025 WL 1142968 (D. Mass. Apr. 18, 2025). (Lyons Memo at 13-14). In short, the Lyons Memos provides that "ICE must adhere to [the Noem Memo]." (*Id.* at 13). It reaffirms that, in instances where the United States has received credible diplomatic assurances that "aliens removed from the United States will not be persecuted or tortured," that the noncitizen "may be removed without the need for further procedures." (*Id.*). It reiterates that, "in all other cases," ICE is to notify the noncitizen of the intended country of removal and "will *not* affirmatively ask whether the alien is afraid of being removed to the country of removal." (*Id.*) (emphasis in original). It further provides that ICE "will generally wait at least 24 hours following service of the Notice of Removal before effectuating removal[,]" but that such removal may be executed after six hours in "exigent circumstances[.]" (*Id.*). Where a noncitizen has not affirmatively stated a fear of persecution or torture "within 24 hours," then ICE "may proceed with removal to the country identified on the notice." (*Id.* at 14). The Lyons memo reiterates the procedure detailed in the Noem Memo for those noncitizens that do affirmatively express a fear of removal to the third country in question. (*Id.*).

Esmail v. Noem, No. 2:25-CV-08325-WLH-RAO, 2025 WL 3030589, at *1–2 (C.D. Cal. Sept. 26, 2025) (footnotes omitted).

"It goes without saying that those who seek to invoke the jurisdiction of the federal courts must satisfy the threshhold requirement imposed by Article III of the Constitution by alleging an actual case or controversy." City of Los Angeles v. Lyons, 461 U.S. 95, 101 (1983). "Abstract

injury is not enough. The plaintiff must show that he 'has sustained or is immediately in danger of sustaining some direct injury' as the result of the challenged official conduct and the injury or threat of injury must be both 'real and immediate,' not 'conjectural' or 'hypothetical.'" Id. at 101–02 (citations omitted). See Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc., 528 U.S. 167, 190 (2000) ("[I]n a lawsuit brought to force compliance, it is the plaintiff's burden to establish standing by demonstrating that, if unchecked by the litigation, the defendant's allegedly wrongful behavior will likely occur or continue, and that the 'threatened injury [is] certainly impending.'" (second alteration in original) quoting Whitmore v. Arkansas, 495 U.S. 149, 158 (1990)).

> To have standing to assert a claim for prospective injunctive relief, a plaintiff must demonstrate "that he is realistically threatened by a repetition of [the violation]." *City of Los Angeles v. Lyons,* 461 U.S. 95, 109, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983). We have "enumerated two ways in which a plaintiff can demonstrate that such injury is likely to recur." *Mayfield,* 599 F.3d at 971. "First, a plaintiff may show that the defendant had, at the time of the injury, a written policy, and that the injury 'stems from' that policy." *Armstrong,* 275 F.3d at 861. "Second, the plaintiff may demonstrate that the harm is part of a 'pattern of officially sanctioned ... behavior, violative of the plaintiffs' [federal] rights.'" *Id.* (alterations in original), *quoting LaDuke v. Nelson,* 762 F.2d 1318, 1323 (9th Cir.1985).

Melendres v. Arpaio, 695 F.3d 990, 997–98 (9th Cir. 2012). "While this test is framed in terms of a past harm already experienced, a plaintiff is not strictly required to have *already suffered* a harm in order to seek prospective injunctive relief." Esmail v. Noem, No. 2:25-CV-08325-WLH-RAO, 2025 WL 3030589, at *5 n.7 (C.D. Cal. Sept. 26, 2025). "Rather, 'the plaintiff must demonstrate that he has suffered *or* is threatened with a concrete and particularized legal harm, coupled with a sufficient likelihood that he will again be wronged in a similar way.'" Id. (internal quotation marks and citations omitted) (quoting Bates v. United Parcel Serv., Inc., 511 F.3d 974, 985 (9th Cir. 2007)).

The July 9, 2025 memorandum specifically states: "A 'third country' or 'alternative country' *refers to a country other than that specifically referenced in the order of removal*." Y.T.D. v. Andrews, No. 1:25-cv-01100 JLT SKO, 2025 WL 2675760, at *9 (E.D. Cal. Sept. 18, 2025) (emphasis added), appeal dismissed, No. 25-7265, 2025 WL 4233827 (9th Cir. Dec. 2,

2025). Therefore, it appears that Respondents' third country removal policy applies to Petitioner and Respondents' attempt to remove him to the Philippines. Petitioner further argues that "if the Philippines does not agree to take Mr. Lim, there is a real risk that ICE will try to remove him to a fourth country." (ECF No. 16 at 4.) "Where, as here, 'the harm alleged is directly traceable to a written policy . . . there is an implicit likelihood of its repetition in the immediate future.'" Bates, 511 F.3d at 986 (quoting Armstrong v. Davis, 275 F.3d 849, 861 (9th Cir. 2001), abrogated on other grounds by Johnson v. California, 543 U.S. 499, 504–05 (2005)). Accordingly, the undersigned recommends finding that Petitioner has standing to bring a claim challenging Respondents' third country removal policy. See Esmail, 2025 WL 3030589, at *5 ("The Court is satisfied that, as a noncitizen with a removal order – who is, therefore, inherently subject to the policies articulated in the Noem and Lyons Memos – Petitioner has sufficiently demonstrated 'that he is realistically threatened by a repetition of the violation' at issue." (footnote and some internal quotation marks and citations omitted)).

"'It is well established that the Fifth Amendment entitles aliens to due process of law' in the context of removal proceedings." Trump v. J. G. G., 604 U.S. 670, 673 (2025) (quoting Reno v. Flores, 507 U.S. 292, 306 (1993)). "[A] basic tenet of constitutional due process [is] that individuals whose rights are being determined are entitled to notice of the issues to be adjudicated, so that they will have the opportunity to prepare and present relevant arguments and evidence." Andriasian v. I.N.S., 180 F.3d 1033, 1041 (9th Cir. 1999). Thus, "[f]ailing to notify individuals who are subject to deportation that they have the right to apply for asylum in the United States and for withholding of deportation to the country to which they will be deported violates both INS regulations and the constitutional right to due process." Andriasian, 180 F.3d at 1041. Accord Ibarra-Perez v. United States, 154 F.4th 989, 995 (9th Cir. 2025) ("DHS must also 'notify individuals who are subject to deportation that they have the right to apply for asylum in the United States and for withholding of deportation to the country to which they will be deported'; otherwise, DHS violates their constitutional right to due process." (quoting Andriasian, 180 F.3d at 1041)).

\\\

The removal order states: "Based upon [Petitioner]'s admissions and concessions, the immigration court finds that [Petitioner] is removable/inadmissible as charged in the Notice to Appear. Further, [Petitioner] has made no application(s) for relief from removal under 8 C.F.R. § 1240.11." (ECF No. 18-4 at 1.)

> Under this regulation, if an alien "expresses fear of persecution or harm *upon return to any of the countries to which the alien might be removed*" and "the alien has not previously filed an application for asylum or withholding of removal that has been referred to the immigration judge by an asylum officer in accordance with" a specified regulation, then the IJ must (i) "[a]dvise the alien that he or she may apply for asylum in the United States or withholding of removal," (ii) "[m]ake available the appropriate application forms," and (iii) "[a]dvise the alien of the privilege" of representation by counsel at no expense to the government and of the consequences for "knowingly filing a frivolous application for asylum." 8 C.F.R. § 1240.11(c)(1)(i)–(iii).

Zamorano v. Garland, 2 F.4th 1213, 1222 (9th Cir. 2021) (emphasis added).

Here, the NTA alleged that Petitioner is "a native of TAIWAN and a citizen of PHILIPPINES," (ECF No. 18-5 at 1), putting Petitioner on notice that the Philippines was one of the countries to which he might be removed. The removal order states that Petitioner "has made no application(s) for relief from removal under 8 C.F.R. § 1240.11," (ECF No. 18-4 at 1), and Petitioner does not allege that he was not given an opportunity to assert a fear-based claim for relief from removal to the Philippines during his removal proceedings. Accordingly, to the extent Respondents seek to remove Petitioner to the Philippines, the undersigned recommends finding that Petitioner is not entitled to relief regarding Respondents' third country removal policy.

However, to the extent Respondents seek to remove Petitioner to a country other than Taiwan or the Philippines, Respondents' policy, as set forth in the Noem and Lyon memos, "contravenes Ninth Circuit law, as laid out above. It would be impossible to comply both with Ninth Circuit precedent and the policy." Nguyen, 796 F. Supp. 3d at 728 (citations omitted). See Vu, 2025 WL 3114341, at *9 ("ICE's policy is contrary to Ninth Circuit precedent."). Accordingly, the undersigned recommends finding that Petitioner is entitled to habeas relief on this ground to the extent Respondents seek to remove Petitioner to a country other than Taiwan or the Philippines.

14

With respect to what process is due to a noncitizen who seeks to adjudicate a fear-based claim before removal to a third country, the Court finds <u>A.A.M. v. Andrews</u>, 815 F. Supp. 3d 1124 (E.D. Cal. 2025), instructive. In <u>A.A.M.</u>, the district court stated:

> Several decisions from the Western District of Washington, however, have more thoroughly analyzed the constitutionally proper process by which a noncitizen may seek to adjudicate his fear-based claim before removal to a third country. In *Aden v. Nielsen*, 409 F. Supp. 3d 998 (W.D. Wash 2019) the court found that the noncitizen's right to due process in relation to his removal to a third country "includes the right to a full and fair hearing, an impartial decisionmaker, and evaluation of the merits of his or her particular claim." 409 F. Supp. 3d at 1010 (citing *Torres-Aguilar v. INS*, 246 F.3d 1267, 1270 (9th Cir. 2001)). Accordingly, the court in *Aden* found, "[g]iving petitioner an opportunity to file a motion to reopen—a motion which seeks discretionary relief that may be denied without any sort of hearing—is not an adequate substitute for the process that is due in [the third country removal] circumstances." *Id.* Applying that analysis directly to the DHS Third Country Removal Policy, the court in *Nguyen v. Scott*, No. 25-cv-01398, 2025 WL 2419288 at *18 (W.D. Wash. Aug. 21, 2025), found the "requirements set forth in *Aden* flow directly from binding Ninth Circuit precedent about due process protections before removal to a third country," "[t]hat Ninth Circuit precedent is binding on this Court," and "the application of that precedent in *Aden* is persuasive." 2025 WL 2419288 at *18. The court in *Nguyen* therefore issued a preliminary injunction finding that "Petitioner is likely to succeed on his claim that removal to a third country under [the DHS Third Country Removal Policy], without meaningful notice and *reopening of his removal proceedings for a hearing*, would violate due process." *Id.* at 19 (emphasis added).
>
> Further, in applying the holdings from *Aden* and *Nguyen*, the court in *Abubaka v. Bondi*, No. 25-cv-01889-RSL, 2025 WL 3204369, at *6 (W.D. Wash. Nov. 17, 2025) determined "on the merits of petitioner's argument that due process does not allow respondents to 'remove or seek to remove him to a third country without notice and meaningful opportunity to respond in compliance with the statute and due process in reopened removal proceedings.' " The court in *Abubaka* emphasized that even though DHS's Third Country Removal Policy replaced the policy at issue in *Aden*, the "ruling in *Aden* remains persuasive today and therefore this Court adopts its holdings in *Aden* for the purposes of this ruling ...." *Id.* at 7; *see also Baltodano v. Bondi*, No. 25-cv-1958-RSL, 2025 WL 2987766, at *4 (granting motion for temporary restraining order enjoining Petitioner's removal to third country "without notice and a meaningful opportunity to respond in compliance with statute and due process in reopened removal proceedings").
>
> This court finds these decisions from the Western District of Washington persuasive. Due Process requires that Petitioner receive a full and fair hearing of his fear-based claim in front of a

> neutral adjudicator. This requirement is not satisfied by simply providing Petitioner the time and opportunity to file a discretionary motion to reopen his immigration proceedings.

A.A.M., 815 F. Supp. 3d at 1140–41.

Accordingly, the undersigned recommends enjoining Respondents "from removing Petitioner via a third-country deportation to any country" other than Taiwan or the Philippines if "Petitioner does assert a fear-based claim for relief from removal . . . without first providing him a meaningful opportunity to be heard on his fear-based claim before an immigration judge in compliance with due process." A.A.M. v. Andrews, No. 1:25-cv-01514-DC-DMC (HC), 2025 WL 3685159, at *7 (E.D. Cal. Dec. 19, 2025). See Arenado-Borges v. Bondi, No. 2:25-CV-02193-JNW, 2025 WL 3687518, at *7 (W.D. Wash. Dec. 19, 2025) (enjoining government "from removing or seeking to remove Petitioner to a third country without notice and a meaningful opportunity to respond in reopened removal proceedings before an Immigration Judge.").

**III.**

**RECOMMENDATION**

Accordingly, the undersigned HEREBY RECOMMENDS that:

1. The petition for writ of habeas corpus (ECF No. 1) be GRANTED.

2. Respondents be directed to immediately release Petitioner from custody under the conditions of his most recent order of supervision.

3. Respondents be enjoined and restrained from re-detaining Petitioner unless there are material changed circumstances and a neutral decisionmaker determines that there is a significant likelihood of Petitioner's removal in the reasonably foreseeable future, or Respondents demonstrate by clear and convincing at a pre-deprivation bond hearing before a neutral decisionmaker that Petitioner is a flight risk or danger to the community such that his physical custody is legally justified.

4. Respondents be enjoined and restrained from effectuating Petitioner's removal to a country other than Taiwan or the Philippines unless Respondents adhere to the following procedures:

a. Provide Petitioner and his counsel a minimum of fourteen (14) days to raise a fear-based claim for protection prior to removal; and

b. if Petitioner does assert a fear-based claim for relief from removal, Respondents must provide Petitioner a meaningful opportunity to be heard on his fear-based claim before an immigration judge in compliance with due process.

This Findings and Recommendation is submitted to the assigned United States District Court Judge, pursuant to the provisions of 28 U.S.C. § 636 (b)(1)(B) and Rule 304 of the Local Rules of Practice for the United States District Court, Eastern District of California. Within **FOURTEEN (14) days** after service of the Findings and Recommendation, any party may file written objections, **no longer than fifteen (15) pages, including exhibits**, with the Court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendation." Replies to the objections shall be served and filed within fourteen (14) days after service of the objections. The assigned United States District Court Judge will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636(b)(1)(C). The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. Wilkerson v. Wheeler, 772 F.3d 834, 839 (9th Cir. 2014) (citing Baxter v. Sullivan, 923 F.2d 1391, 1394 (9th Cir. 1991)).

IT IS SO ORDERED.

Dated:    **June 17, 2026**                      /s/ Erica P. Grosjean
                                        UNITED STATES MAGISTRATE JUDGE